IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 15, 2015

## LeSERGIO WILSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-1912     Cheryl Blackburn, Judge**

---

**No. M2014-01763-CCA-R3-PC – Filed September 17, 2015**

---

The petitioner, LeSergio Wilson, appeals the denial of his petition for post-conviction relief, arguing that he received the ineffective assistance of counsel.  After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Kara Everett, Nashville, Tennessee, for the appellant, LeSergio Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Following a jury trial, the petitioner was convicted of first degree felony murder and especially aggravated robbery and sentenced to life imprisonment plus twenty-five years.  His convictions and sentences were affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal.  State v. Lesergio D. Wilson, No. M2012-00500-CCA-R3-CD, 2013 WL 3148279, at *1 (Tenn. Crim. App. June 18, 2013), perm. app. denied (Tenn. Oct. 17, 2013).

The underlying facts were recited by this court on direct appeal as follows:

The [petitioner's] convictions relate to the robbery and shooting death of the victim, Usama Shehata. At trial, the victim's wife, Mariam Zaky, testified that she and her husband were Egyptian immigrants and that the victim had been in the United States for one year prior to his murder. Ms. Zaky stated that her husband carried a wallet that typically contained two to three hundred dollars in cash, in addition to his green card, his social security card, papers, and photographs. The victim also carried his car keys and his cellular telephone with him.

Magdy Daniel testified that he owned and operated the Smoke Depot on Porter Road, a tobacco store. Mr. Daniel testified that the victim had only worked for him for seven days at the time of his murder. Mr. Daniel explained that, on the day of the murder, April 7, 2010, he had worked the morning shift at the store, and the victim worked the second shift alone. The victim was to close the store at 10:00 p.m. Mr. Daniel had three security cameras inside his store, and one of those cameras recorded sound. The time-stamp on the surveillance footage showed the victim leaving the store through the front door at approximately 9:58 p.m., although the State argued in closing argument, without objection, that the time-stamp was approximately 13 minutes slow. Although the parking lot is not visible on the video, a short "bang" can be heard at 9:58:38, followed by a second "bang" at 9:58:46.

Ajeel Mohammad testified that he operated a cellular telephone store that was located in the same building as and next door to the Smoke Depot. Mr. Mohammad stated that he had a security camera outside his store which also showed the front door of the Smoke Depot. Mr. Mohammad acknowledged that the time-stamp on the surveillance camera was close to one hour slow. According to Mr. Mohammad's video, at 8:56:50 on April 7, a person approached the front door of the Smoke Depot and then walked away. The video then shows the victim leaving the Smoke Depot at 9:10:20.

Danielle Howse testified that, at approximately 10:30 p.m. on April 7, she was driving her vehicle on Porter Road when she noticed a man on his knees next to a vehicle; the man's head was down, and he was motionless. Ms. Howse noticed blood on the man's shirt and pants. She called out to him from her vehicle, but she got no response. She then turned into the parking lot, and her vehicle's headlights revealed blood coming from the man's head. When she again got no response from the man, Ms. Howse called 9-1-1. Ms. Howse observed what appeared to be "a

lunch bag and a bottle of water" resting on the back of the vehicle. Ms. Howse recognized the victim as an employee of the Smoke Depot, which she had patronized on previous occasions.

Officer Frederick Nelson with the Metro Nashville Police Department ("Metro") testified that, at 10:38 p.m. on April 7, he responded to a call about a shooting at Porter Road and Greenwood Avenue. When Officer Nelson arrived on the scene, he found the victim lying on the ground next to the vehicle. Officer Nelson interviewed Ms. Howse and established a perimeter.

Metro Detective Matthew Filter responded to the crime scene on April 7 and searched the victim to determine his identity. Detective Filter testified that the victim had no identification and nothing in his pockets when he was discovered. The police determined his identity after checking the registration of the vehicle next to the victim. Law enforcement officers later contacted the owner of the Smoke Depot and the victim's wife, who positively identified him. Detective Filter stated that no fingerprint or deoxyribonucleic acid ("DNA") evidence linked the [petitioner] to the crime. Detective Filter stated that he searched the railroad tracks in an attempt to locate the personal items allegedly discarded by the [petitioner], but he was unable to locate any of those items.

Doctor Tom Deering, a medical examiner, testified that he performed an autopsy on the victim. During the course of the autopsy, Doctor Deering recovered a bullet from the victim's back. Doctor Deering determined that the bullet entered the victim's head above his left ear, traveled through the victim's brain, and came to rest above and near his right shoulder blade. Doctor Deering was able to determine that the gun was between six and 24 inches from the victim's head when it was fired, based on the gun powder stippling on the victim's head. Doctor Deering testified that the cause of the victim's death was a single gunshot wound to the head and that the manner of death was homicide.

Metro Detective Curtis Hafley testified that on April 16, 2010, he arranged the [petitioner's] arrest on an outstanding misdemeanor warrant.[1]

---

[1]Although it was unknown to the jury, Detective Hafley was also investigating the [petitioner] on an unrelated murder charge. The [petitioner] was eventually charged with first degree murder in this separate incident as well. The outstanding warrant, apparently unrelated to either case, was described by Detective Hafley as involving either a "domestic violence" case or a "simple assault" case.

Detective Hafley had previously met with Metro patrol officers, showing them photographs of the [petitioner] and informing them of the warrant. While in an unmarked vehicle and street clothing, Detective Hafley located the [petitioner] at the Panorama Apartments, where the [petitioner's] girlfriend allegedly resided:

> I then parked -- I saw [the petitioner] walking down from the apartment building. He got in the passenger's side of his car. It was daylight, sunshine, clear view of him, just the opposite side of the parking lot, not very far away. I recognized him immediately. I got on the radio, told the other police cars that I had met with about looking for [the petitioner] and where he was, what he was wearing, what car he was in, and where he was sitting. And they drove out of the -- the vehicle drove out of the apartment complex. I followed them. I saw the police cars pull in behind him to pull him over, and I continued on.
>
> . . . .
>
> . . . I turned around and drove back by and saw that they had located him and that they were serving the warrant. But I did not stop, I did not talk to anybody.

Approximately two weeks later, Detective Hafley contacted the [petitioner] by telephone to arrange a meeting, explaining to the [petitioner] that he needed to discuss an ongoing investigation with him. On May 1, Detective Hafley and Detective Mark Woodfin met the [petitioner] in a restaurant parking lot. During their interview with the [petitioner], the [petitioner] indicated that he typically resided with his grandmother at 66 Creighton Avenue. Detective Hafley identified the Creighton Avenue address and the Panorama Apartments on a map of East Nashville, both of which are within a few blocks of the crime scene. The [petitioner] told Detective Hafley that the gun recovered from the car during his arrest on April 16 was not his. He claimed that, when exiting the apartment complex, he found the gun in a discarded bag next to his car.

On May 21, 2010, Detective Hafley conducted a second interview with the [petitioner], this time at the police precinct. The [petitioner] was not wearing a shirt when he was brought in for the interview. During the interview, Detective Hafley asked the [petitioner] if he was under the

influence of any drugs or alcohol, and the [petitioner] stated that he had consumed approximately half of a half-pint of brandy just prior to his arrest. He also stated that he was "getting cold" because he was not wearing a shirt, but he then stated that he was fine. The [petitioner], who was 23 years of age at the time, signed a waiver of his constitutional rights after being provided Miranda warnings. Although he initially maintained that he found the .357 handgun in a bag by his car at the Panorama Apartments, he eventually admitted that he got the gun "from out South." When confronted about the victim's murder, the [petitioner] stated that he knew nothing about it, but when the detectives told him that the gun matched the bullet found in the victim, the [petitioner] stated that he robbed the victim.

The [petitioner] told them that when the victim exited the Smoke Depot and walked to his car, the [petitioner] told him to "give me everything in your pockets. He gave me everything, put everything on the car. So I mean he was cooperative so I just took everything." The [petitioner] stated that the victim put everything on the back of the trunk. After robbing the victim, the [petitioner] stated that he turned and fled down the railroad tracks. He turned back when the heard the victim yell and believed that the victim was pointing something at him, which prompted the [petitioner] to fire two gunshots at the victim. The [petitioner] told the officers that the victim's wallet contained $200 "and a whole bunch of pictures and papers and stuff like that." The [petitioner] then claimed that he discarded the wallet on the train tracks. He also stated that he stole the victim's cellular telephone and car keys. The [petitioner] eventually changed his story and indicated that, while standing by the trunk of the car, he shot the victim in the head. After the detectives pressed him about an accomplice, the [petitioner] again changed his story and indicated that a man named Trevon assisted him in the crime and was the actual shooter. Law enforcement officers never found anyone named Trevon matching the description given by the [petitioner].

Metro Officer Marty Reed testified that, on April 16, 2010, Detective Hafley requested that he stop a car in which the [petitioner] was a passenger to issue an outstanding misdemeanor warrant. When Officer Reed stopped the car, which was driven by the [petitioner's] girlfriend, Alicia Nicole Williams, he noticed the [petitioner] "leaning down in the front like towards the floorboard of the car." Officer Reed had previously identified the [petitioner] from a mug shot and recognized him as the person named in the warrant. When Officer Reed directed the [petitioner]

to step out of the vehicle and place his hands behind his back, the [petitioner] began to struggle. Officer Reed stated that he needed the aid of two additional officers to handcuff the [petitioner]. After placing the [petitioner] under arrest, Officer Reed noticed "in the front floorboard . . . sticking out underneath the seat . . . a handle to a pistol and a cylinder, which would be a revolver." Officer Reed stated that the revolver had six rounds in the cylinder at the time he recovered it from the vehicle. When Officer Reed asked the [petitioner] how the gun came into his possession, the [petitioner] responded, "[P]eople drive my car."

Marcus Akins testified that, at his cousin's funeral, he met the [petitioner], who was introduced to him as his cousin's best friend. Sometime after meeting the [petitioner], Mr. Akins learned of the victim's murder on the news. In May, 2010, Mr. Akins encountered the [petitioner] at the home of a mutual friend by the name of Torian Williams. Mr. Akins overheard the [petitioner's] telling Mr. Williams that the [petitioner] had killed someone. Later, the three men were standing outside together, and the [petitioner] again stated that he had "just killed somebody" and that he "had did [sic] something at the store on Porter Road." Mr. Akins told the [petitioner] that he had seen, on the local news, surveillance camera footage of someone trying to open the door of the Smoke Depot and asked whether that was the [petitioner]. The [petitioner] responded that it was he.

Special Agent Shelly Betts with the Tennessee Bureau of Investigation ("TBI") crime laboratory testified that she examined the bullet recovered from the victim's body and stated that it was a .38 or .357 caliber hollow point bullet. She confirmed that the ammunition recovered with the .357 handgun were also hollow point bullets. After examining the .357 revolver recovered from the [petitioner], Special Agent Betts determined that the bullet recovered from the victim's body had been fired from the [petitioner's] gun.

With this evidence, the State rested its case. Following the trial court's denial of the [petitioner's] motion for judgments of acquittal and a Momon colloquy, see Momon v. State, 18 S.W.3d 152, 161-62 (Tenn. 1999), the [petitioner] elected not to testify.

Based on this evidence, the jury convicted the [petitioner] as charged of felony murder and especially aggravated robbery. The trial court imposed an automatic sentence of life imprisonment for the murder conviction. Following a sentencing hearing, the trial court sentenced the

6

[petitioner] to 25 years for especially aggravated robbery and ordered that sentence to be served consecutively to the [petitioner's] life sentence, for an effective sentence of life plus 25 years.

Id. at *1-4.

The petitioner filed a *pro se* petition for post-conviction relief on January 13, 2014, and following the appointment of counsel, amended petitions were filed on May 30, 2014, and July 30, 2014. In his petitions, the petitioner alleged, among other things, that he received the ineffective assistance of counsel at trial and on direct appeal.

At the July 30, 2014 evidentiary hearing, trial counsel testified that he had been a practicing attorney for over fifteen years and was appointed to represent the petitioner while employed by the public defender's office. At the time of counsel's appointment, the petitioner had a murder charge pending in another case. He and co-counsel were concerned that the State would seek the death penalty in the petitioner's other case and would use any convictions in this case as an aggravator. Co-counsel met with the petitioner weekly, and trial counsel reviewed the discovery with the petitioner. Trial counsel believed the petitioner understood the legal issues they were dealing with, but the petitioner "didn't appreciate how risky the situation was and the potential consequences."

Trial counsel recalled that following the robbery and shooting in this case, the petitioner was stopped by the police and a gun matching the description of the gun used in the shooting was found in the petitioner's vehicle. The petitioner subsequently made statements indicating that he was involved in the crimes. Trial counsel and co-counsel filed a motion to suppress the petitioner's statements based upon the petitioner's intoxication and his being shirtless and placed in a cold room during the interview, which lasted a considerable length of time. Counsel also alleged in the motion that the interviewing detective had been coercive. A second motion to suppress was filed, alleging that the police did not have probable cause to stop the petitioner and search his vehicle. However, both motions were unsuccessful. Trial counsel said that the "most damning bit of evidence" against the petitioner was his possession of the gun used in the shooting, as well as his statement.

Trial counsel said he investigated the petitioner's upbringing, educational level, and mental health history and obtained all of his school records. He said that he obtained the services of a neuropsychologist, Dr. Pamela Auble, "[t]o make sure that [counsel] were aware of any cognitive or psychological issues and to make sure [the petitioner] was competent and to help [counsel] with mitigation." Dr. Auble recommended that counsel obtain experts in substance abuse and brain injuries, and counsel's motions to procure the services of Dr. Walker and Dr. Street were successful. Counsel sought their services to

7

"see if [the petitioner] was competent to stand trial, to see if . . . there were cognitive or physiological issues that would affect [the petitioner's] ability to have the mental state of committing an aggravated robbery, to see if there were any other issues that would be important for his defense, and ultimately for mitigation if [the petitioner] went to trial on a capital case."

Trial counsel recalled that the in-house private investigator for the public defender's office investigated the petitioner's case, but he could not recall whether an outside investigative service had been used. He said that he prepared the petitioner's case as a death penalty case and requested a mitigation expert. However, the trial court denied his request because the State had not filed a notice of intent to seek the death penalty. Trial counsel then filed an interlocutory appeal, which was denied by this court.

Trial counsel said he did not think to include the denial of a mitigation expert in his motion for a new trial. He elaborated that he viewed "the mitigation as a separate issue unrelated to the trial." Counsel said that the death penalty notice in the petitioner's other case was filed after the conclusion of this case. Counsel subsequently withdrew from the petitioner's case after the death penalty notice was filed.

Co-counsel testified that she had been a practicing attorney for nine years and was employed with the public defender's office. She said that trial counsel was the lead attorney in the petitioner's case. She said it was "very clear" that the State was going to seek the death penalty in the petitioner's other murder case and that both of the petitioner's cases were closely intertwined. Co-counsel met with the petitioner on a regular basis and was more involved in the day-to-day interaction and client management than lead counsel. Co-counsel said she noticed that the petitioner had "very good . . . covering skills," was "very street savvy and was used to making his way in the world and used to putting up a facade of understanding and comprehension and control of everything. I think that he actually had a functional understanding that was much less than that." Co-counsel explained the petitioner's "covering skills" as "a failure to ask questions, a failure to identify things that he didn't understand, acting as if he understood everything that was going on, and saying yes when asked if he understood."

Co-counsel said she reviewed the petitioner's videotaped statement several times and believed "there was a lot of covering going on in that of him pretending to, again, sort of be in control while not, pretending to understand everything when he didn't." She said that she and lead counsel were concerned that the petitioner's statement was not voluntary "both because of his intoxication, his mental state at the time, his general mental capacity, and what [counsel] saw as . . . threats made by the interviewing detective." Co-counsel acknowledged that she and lead counsel did not obtain any expert services for the suppression hearing but did so for the case as a whole.

8

Margaret Wilson, the petitioner's grandmother, testified that the petitioner lived with her "the majority of the time" he was growing up and did not have any special education needs in school. She said that the petitioner "[s]ometimes" followed the directions she gave him and described him as "bull headed or pig headed because he was stubborn." The petitioner was involved in an automobile accident in 2007 or 2008, after which he seemed to have difficulty understanding what was being said to him. Ms. Wilson said that the petitioner started drinking and "would walk around half of the day with a bottle in his pocket and something in a cup." She said that the petitioner "would go for days and pop pills and drink." On cross-examination, Ms. Wilson acknowledged that she and the petitioner also had conversations where he responded in accord to her questions.

The twenty-seven-year-old petitioner testified that he did not believe counsel effectively represented him at trial and that he had trouble understanding some of the legal concepts explained to him. He said that he had been diagnosed with bipolar disorder, post-traumatic stress disorder, and "something else" that he could not remember. On cross-examination, the petitioner said that counsel should have asked more questions about his background and mental health. He admitted that counsel obtained a psychologist and other doctors to examine him and obtained his medical records. He could not explain how any additional information might have affected his trial.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered a written order on August 25, 2014, denying post-conviction relief.

## ANALYSIS

On appeal, the petitioner argues that trial counsel was ineffective for failing to (1) utilize information uncovered during the petitioner's neuropsychiatric examination at trial and at the suppression hearing, and (2) preserve the denial of a mitigation expert in the motion for a new trial and subsequent appeal. The State counters that the post-conviction court properly determined that the petitioner failed to demonstrate that he received ineffective assistance of counsel.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely

9

factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

10

In the denying the petition, the post-conviction court concluded:

The main components of the petitioner's ineffective assistance of counsel argument are the two issues raised in the second amended petition – that trial counsel failed to utilize mental health experts and failed to challenge the Court's denial of a mitigation expert on direct appeal. The mental health-based issue, in turn, has two components: trial counsel's failure to make a mental health-based argument regarding the motion to suppress and failure to introduce mental health evidence at trial.

Regarding the first mental health issue, trial counsel sought expert services to determine any mental health-based concerns the petitioner might have. Trial counsel's ability to do so was limited, given that the State did not file a notice to seek the death penalty in either of the petitioner's cases until this case was on direct appeal. Although trial counsel did not acquire expert services until after the order denying the motion to suppress the petitioner's statements was filed, counsel did not simply file away the information derived from these experts to be used as capital mitigation. The Court accredits [trial counsel's] account that trial counsel identified several potential uses for this expert evidence before trial, but upon reviewing the evidence derived from the experts, counsel concluded the evidence did not provide a basis for rearguing the motion to suppress. Given the Court of Criminal Appeals' opinion affirming this Court's denial of the suppression motion and the lack of any mental health-based evidence at the post-conviction hearing, the Court concludes this strategy was a reasonable one and did not constitute deficient performance.

Furthermore, although the petitioner testified that trial counsel should have investigated his mental health background in greater detail, he was unable to provide specific examples of the evidence trial counsel should have developed. Reviewing the record, the Court concludes trial counsel thoroughly investigated the petitioner's social and psychological history; the scope of this investigation was about as extensive as possible within the confines of a non-capital case. Trial counsel sought funds for a mitigation expert three times, but the Court denied these motions. The petitioner also claims that trial counsel should have presented evidence regarding his "background" at trial, but little to no such evidence was presented at the post-conviction hearing. [The petitioner's grandmother] testified about a car accident that purportedly affected the petitioner's mental state, but no evidence was introduced to support this testimony.

11

There was no evidence presented regarding diminished capacity, intellectual disability, or other type of claim that would have been admissible during trial. The petitioner also has not identified any other motions that could have been filed based on this evidence before trial.

In the Court's view, trial counsel's handling of the mental health investigation in this case was neither deficient nor prejudicial. Consequently, the Court concludes trial counsel did not render ineffective assistance as to this issue.

. . . .

The petitioner also faults trial counsel for not challenging this Court's denial of a mitigation specialist in either the motion for new trial or direct appeal. Trial counsel conceivably could have pursued the issue following the Court of Criminal Appeals' denial of the petitioner's Rule 10 appeal, but it is doubtful such an appeal would have been successful. The Court notes the Court of Criminal Appeals' opinion in <u>State v. Jason Christopher Underwood</u>, No. M2006-01826-CCA-R3-CD (Tenn. Crim. App. Dec. 10, 2008), in which the appellate court concluded the defendant in that non-capital case did not show the specialized need for a mitigation expert when the other court-appointed experts were able to produce the same evidence that would have resulted from a mitigation expert's investigation. . . . Similarly, in this case the petitioner did not present any evidence at the post-conviction hearing regarding the type of evidence a mitigation expert would have produced and how it would have differed from any of the evidence produced by the [c]ourt-appointed experts. In other words, post-conviction counsel has not established how trial counsel would have been able to show the particularized need necessary for obtaining mitigation services at trial or successfully arguing the issue on appeal. Accordingly, trial counsel's actions did not prejudice the petitioner, and therefore the Court concludes trial counsel did not render ineffective assistance as to this issue.

We conclude that the record supports the post-conviction court's finding that trial counsel provided effective representation. Trial counsel testified that the petitioner understood the legal issues they were dealing with, but the petitioner "didn't appreciate how risky the situation was and the potential consequences." Trial counsel said that he obtained the services of a neuropsychologist who recommended that he obtain experts in the fields of substance abuse and brain injuries, and counsel filed successful motions to procure the services of those experts. Trial counsel's request for a mitigation expert was

12

denied because the State did not file a notice of intent to seek the death penalty, and counsel's interlocutory appeal to this court was denied. Counsel did not include the denial of a mitigation expert in the motion for new trial because he viewed "the mitigation as a separate issue unrelated to the trial." In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In this matter, the State correctly notes that the petitioner did not present, at the evidentiary hearing, a witness to show that a mitigation expert would have benefitted him at trial by providing information not already available to trial counsel through the three expert witnesses provided by the court. Thus, he has failed to establish prejudice.

In sum, the petitioner has failed to show that trial counsel was deficient in his representation. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE

13